Shamus T. O'Doherty, ISB #9626
sto@randalldanskin.com
Brook L. Cunningham, *Pro Hac Vice*
blc@randalldanskin.com
RANDALL | DANSKIN, P.S.
601 W. Riverside Avenue, Suite 1500
Spokane, WA  99201-0653
Telephone: (509) 747-2052
Facsimile: (509) 624-2528

Attorneys for Plaintiff

## UNITED STATES DISTRICT COURT
## DISTRICT OF IDAHO

| | |
|---|---|
| BETHANY MIKOLAS,<br><br>                      Plaintiff,<br><br>vs.<br><br>UNIVERSITY OF IDAHO, a public university,<br><br>                      Defendant. | Case No.  2:17-cv-426-REB<br><br>**PLAINTIFF'S STATEMENT OF MATERIAL FACTS IN SUPPORT OF OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT (Docket No. 40)** |

**A.**     **The Assault, Reporting, and Title IX Complaint.**

**1.**  On February 11, 2016, Bethany Mikolas ("Bethany") was sexually assaulted by another law student off campus. (O'Doherty Decl., Ex. A (hereinafter "Mikolas Dep."), 57:6-12; 251:25-254:13; O'Doherty Decl., Ex. B (hereinafter "Scoggin Dep."), 55:14-15; 59:5-16; Declaration of Bethany Mikolas (hereinafter "Mikolas Decl."), ¶ 2)

**2.**  On February 23, 2016, Bethany tearfully reported the sexual assault to Dean Jeffrey Dodge ("Dean Dodge"), an Associate Dean at University of Idaho's ("UI") school of law which Bethany was attending.  (O'Doherty Decl., Ex. C (hereinafter "Dodge Dep."), 36:6-9; 86:23-24; Mikolas Dep., 57:6-12; 65:5-10)

**3.**  Bethany's report was significant, as Dean Dodge had never received, and was not aware of any

other sexual assault report related to the law school. (Dodge Dep., at 53:24-54:20; 58:5-19)

**B.**    **UI's Title IX Investigation into Bethany's Reported Assault Took Over Seven Months to Resolve.**

**4.**  UI's own policy contains a sixty day timetable for completion of the investigation and hearings once a sexual assault is reported, which coincides with guidance from the Office of Civil Rights ("OCR") in place at the time commonly referred to as Dear Colleague Letters ("DCL"). Bethany was told to typically expect resolution in sixty days. (O'Doherty Decl., Ex. D (hereinafter "Agidius 30(b)(6) Dep."), 158:16-22; O'Doherty Decl., Ex. E (hereinafter "Agidius Dep."), 192:3-24; 194:11-14; Mikolas Dep., 101:21-103:8)

**5.**  UI testified that it took over five months (February 23, 2016 to August 30, 2016) to complete the Student Disciplinary Review Board ("SDRB") hearings and over seven months to fully resolve the administrative process when the SDRB's decision finding that the perpetrator violated the student code of conduct for the sexual assault was upheld by the Student Appellate Committee ("SAC") on September 26, 2016, and the perpetrator was finally suspended. (Agidius 30(b)(6) Dep., 156:2-157:10; 158:23-159:20; Agidius Dep., 195:2-10; 201:20-202:4)

**6.**  The delays were the result of UI being understaffed, having a lack of resources, a model that was not ideal, and receiving over one-hundred Title IX Complaints each year. (Agidius 30(b)(6) Dep., 205:4-8; Agidius Dep., 60:22-61:1; 62:4-10; 65:4-9; O'Doherty Decl., Ex. F (hereinafter "Roberts Dep."), 29:2-9; 90:11-14; O'Doherty Decl., Ex. G (hereinafter "Atkins Dep."), 19:23-25)

**7.**  UI employee Alex Roberts ("Roberts") testified that the seven months it took to resolve Bethany's Title IX complaint was **not** a reasonable amount of time and that he had expressed concerns to UI regarding its untimeliness on Title IX issues.  (Roberts Dep., 91:15-19; 130:21-25)

**8.**  In August 2016, UI made drastic changes to its Title IX investigation and adjudication structure

to speed up the Title IX process, hiring three full-time Title IX Investigators, increasing its Office of Civil Rights and Investigation ("OCRI") staff from one to six non-volunteer employees, adjusted the quorum needed to hold hearings, and instituted a centralized database to streamline reporting and processing of cases. (Agidius 30(b)(6) Dep., 33:11-34:9; 39:25-40:5; 42:23-43:4; 44:21-45:22; 46:3-6, 14-18; 48:16-20, 22-23; 51:22-25; 119:11-122:9; 161:22-162:7; 163:12-15; Agidius Dep., 19:20-21; 62:17-63:5; 64:11-14; 195:18-21; Dodge Dep., 24:12-14; 25:10-16; O'Doherty Decl., Ex. H (hereinafter "Eckles 30(b)(6) Dep."), 32:16-22; 33:25-34:2, 8-15; 43:11-44:7; 44:19-46:8)

## C.    UI Failed to Respect Bethany's Confidentiality and Privacy During the Investigation.

**9.**   UI tells victims the Title IX process is confidential and private, meaning UI "will share information with those who have a need to know or on a need-to-know basis with the institution." (Agidius 30(b)(6) Dep., 166:22-167:10; Agidius Dep., 108:8-15)

**10.**   UI's Title IX Coordinator, and other employees, testified that the DCLs address the need to keep the Title IX process private. (Agidius Dep., 105:3-6; Atkins Dep., 56:5-57:1)

**11.**   When Bethany reported her sexual assault to Dean Dodge he expressed to her that the Title IX process would be private and confidential and Bethany expressed her concern about other students learning of the sexual assault. (Dodge Dep., 91:7-25; 98:9-11; Agidius Dep., 114:12-24; Mikolas Dep., 58:21-59:8; 79:2-9; 113:10-14)

**12.**   The Title IX Coordinator Erin Agidius ("Agidius") and Dean Dodge both testified that Bethany expressed real concerns about keeping the substance of this Title IX complaint private from her other law school classmates. (Agidius Dep., 105:7-11; Dodge Dep., 90:14-17)

**13.**   UI testified the substance of the Title IX Complaint will not be disclosed to students and faculty, and that any student interviewed is instructed not to share the information with other

students and is read a script on confidentiality. (Agidius 30(b)(6) Dep., 168:19-23; 174:5-9; Agidius Dep., 106:10-14; 106:23-107:2; 107:23-108:7; 109:17-22; 110:14-111:8)

**14.** The purposes behind such confidentiality is to protect the privacy of the victim, minimize potential retaliation, threats, or harassment, and keep the assault from being shared with the student population. (Agidius 30(b)(6) Dep., 169:6-170:14; Atkins Dep., 50:10-13; 51:2-6)

**15.** UI's psychological expert testified it can be psychologically damaging to the victim of a sexual assault if the details of the sexual assault become known. (O'Doherty Decl., Ex. I (hereinafter "Green Dep."), 18:5-8)

**16.** Both the victim and the perpetrator are instructed not to discuss the Title IX matter with other students, and may be subject to discipline if they do. (Agidius 30(b)(6) Dep., 171:9-172:3; 176:19-25; Agidius Dep., 111:23-112:16; Atkins Dep., 49:12-22)

**17.** The promises to Bethany of privacy and confidentiality were destroyed when the perpetrator's attorney, acting on his behalf, contacted multiple law students about the sexual assault, allowing the information to be shared with the general law school population. (Agidius Dep., 112:20-113:4)

**18.** Bethany raised concerns with the OCRI and Dean of Students ("DOS") offices that her confidentiality and privacy were being violated by the perpetrator sharing information with students in her class. (Dodge Dep., 103:10-14; 235:9-13)

**19.** On March 28, 2016, Bethany emailed Title IX Coordinator Agidius, among others, stating she was very concerned her friends were being contacted and questioned by the perpetrator's attorney, and that she had been assured the process would be private and confidential which played into her decision to report the assault. (Agidius 30(b)(6) Dep., 182:1-7; Agidius Dep., 118:16-24; O'Doherty Decl., Ex. J, March 28, 2016 email)

**20.** UI investigator Jessica Atkins ("Atkins"), responded that she was "very concerned" with the

attorney's behavior, stating it bordered on retaliation and was being done to make Bethany feel

vulnerable. (Atkins Dep., 83:1-21; 84:13-25; O'Doherty Decl., Ex. J, Mach 28, 2016 email)

**21.** On September 7, 2016, Bethany emailed Roberts from the DOS expressing concerns on the

same issue, and told him it was being done to intimidate and harass her, she cried at home, she was

in therapy and suffering from panic, fear and depression, and she had been unable to go to school

for weeks.  (Agidius 30(b)(6) Dep., 180:10-18; O'Doherty Decl., Ex. K, September 7, 2016 email)

**22.** In response to that email, Roberts agreed with Bethany's concerns and stated the assailant's

attorney is "out of control." (O'Doherty Decl., Ex. K, September 7, 2016 email; Agidius 30(b)(6)

Dep., 181:8-13)

**23.**  Dean Dodge also had concerns about the perpetrator's attorney contacting students and

Bethany's privacy being violated. (Dodge Dep., 240:24-241:20)

**24.**  However, Title IX Coordinator Agidius dismissed the confidentiality and privacy concerns

raised by Bethany, Roberts, Atkins, and Dean Dodge, and UI took no action to protect Bethany's

privacy or the confidentiality of the Title IX process in response to these concerns. (Agidius

30(b)(6) Dep., 173:8-16; 174:10-22; 183:6-16; 185:11-16; Agidius Dep., 181:18-182:2, 20-22)

**25.**  Roberts and Atkins testified that if the assailant had been contacting students in the manner

his attorney was it would have been a violation of the student code of conduct. (Roberts Dep.,

80:11-14; Atkins Dep., 74:24-75:11)

**26.**  Atkins testified that she expected UI to contact the assailant's attorney and address the Title

IX confidentiality requirements.  (Atkins Dep., 73:2-6; 87:18-25)

**27.**  UI does not recall any other Title IX case at UI in which an attorney was allowed to openly

question students about a sexual assault.  (Agidius 30(b)(6) Dep., 188:2-189:3; 190:7-9)

**28.**  Agidius testified that despite the student population learning of the sexual assault from the

perpetrator's attorney, Bethany was still expected not to speak with any other students about the sexual assault, and was not allowed to clarify inaccuracies. (Agidius Dep., 179:6-20)

**29.** The assailant's friends raised hypotheticals in classes with Bethany about men being falsely accused of sexual assault and posted about the matter on Facebook in an effort to harass and retaliate against her. (Mikolas Dep., 234:4-11; Scoggin Dep., 102:3-16; 103:6-10; 119:12-23)

**30.** UI testified that the Title IX process is an administrative process which it has complete control over. (Agidius 30(b)(6) Dep., 174:23-175:9; Agidius Dep., 115:15-19)

**D.     Accommodations.**

**31.** UI claims that its decisions on how to properly accommodate a victim during UI's Title IX investigation are made through a collaborative effort on a case-by-case basis.  (Agidius 30(b)(6) Dep., 28:6-14; 58:11-59:1, 19-23; Agidius Dep, 78:7-12; 79:7-12; 80:4-8; 82:11-15; 210:9-11; 214:13-15)

**32.** At the UI there is no structured hierarchy for deciding proper accommodations when faculty disagree. (Agidius 30(b)(6) Dep., 60:6-13; 67:8-16; 72:24-73:3; Agidius Dep., 82:4-10)

**33.** In 2016, UI faculty did not know who was responsible for accommodation decisions. Dean Dodge testified it was the responsibility of Agidius and Roberts.  Conversely, Roberts testified he had nothing to do with accommodation decisions.  Agidius, despite claiming to be the primary resource for Title IX issues, does not know if she could make accommodation decisions on her own, does not know if she was trained on proper accommodations, and does not know who at the UI would have authority to make accommodation decisions.  (Dodge Dep., at 60:23-62:19; 138:12-18; 203:20-25; 270:21-271:3; Roberts Dep., 61:16-19; Agidius 30(b)(6) Dep., 69:17-23; Agidius Dep., 80:23-81:7, 18-23; 83:3-6; 211:12-18)

**34.** UI does not provide specific training to its employees on providing interim accommodations

to the victims during the Title IX process. (Agidius 30(b)(6) Dep., 132:23-133:6, 15-18)

**35.**   Agidius does not recall consulting or referencing the DCLs when evaluating Bethany's accommodation requests. (Agidius Dep., 84:14-17; 87:11-17)

**36.** Dean Dodge expected Agidius and members of the DOS's office to be reviewing the DCLs in making accommodation decisions and to ensure compliance with Title IX.  (Dodge Dep., at 39:2-21; 40:18-42:1; 45:14-46:5, 7-11; 47:20-48:3)

### E.      UI Did Nothing to Address Bethany's Safety Concerns.

**37.**   Shortly after the sexual assault, the assailant sent Bethany a threatening text message telling her to "go fuck herself" and to "eat shit and die." This was provided to UI and acknowledged as threatening. (Agidius Dep., 145:5-11; Agidius 30(b)(6) Dep., 156:1-11; Atkins Dep., 64:22-23; O'Doherty Decl., Ex. L, text message)

**38.**   After the sexual assault and threatening text message, Bethany was afraid to be around the assailant and feared for her safety, viewing him as predator. (Mikolas Dep., 52:11-17; 71:7-72:4)

**39.**   Bethany repeatedly told Agidius, Dean Dodge, and the DOS office, she feared sharing classes with the assailant and being in his proximity.  (Mikolas Dep., 151:18-152:4)

**40.**   Bethany met with Agidius to tell her she felt unsafe, her friends were escorting her around school, the assailant was deliberately getting close to her in a threatening way and she did not feel safe at school. (Mikolas Dep., 114:14-115:3; 115:25-116:21; 220:15-21)

**41.**   Bethany sent at least five (5) emails to UI, in addition to repeated verbal conversations, expressing her safety concerns related to the assailant, stating, among other things: she was afraid to be around the assailant; her friends had to escort her around because she did not feel safe; the no contact order was meaningless since she had daily contact with him in class and at the school; the perpetrator would deliberately confront her at the school entrance where he regularly smoked;

and that she felt unsafe, threatened, intimidated and harassed around the assailant, among other safety concerns. (Agidius 30(b)(6) Dep., 142:2-16; Dodge Dep., 180:18-181:1; 194:2-21; 196:2-4; 201:14-202:2; 201:8-11; 235:1-6; Dodge Dep., 195:10-14; O'Doherty Decl., Ex. P, August 21, 2016 email; O'Doherty Decl., Ex. R, August 21, 2016 email; O'Doherty Decl., Ex. S, August 21, 2016 email; O'Doherty Decl., Ex. U, August 22, 2016 email; O'Doherty Decl., Ex. X, March 30, 2016 email; Mikolas Decl., ⁋ 8)

**42.**  The only thing UI did in response was give her a link to "Safe Walk" to escort her to her car and relocate the perpetrator's smoking location. (Agidius 30(b)(6) Dep., 141:1-18)

**43.**  The no-contact order sent to both parties at the beginning of the Title IX process was merely a no communication order, as the perpetrator was allowed to remain in her classes, there was no proximity or physical limitations on either party, other than a request to sit on other sides of the classroom, and Bethany came in daily contact with the perpetrator in classrooms, hallways, and buildings, among other places. (Agidius 30(b)(6) Dep., 153:1-17; 153:24-154:3; Dodge Dep., 114:4-9; 117:1-118:10; Agidius Dep., 125:8-126:11; 127:12-15)

**44.**  Dean Dodge acknowledged it was a no-communication order. (Dodge Dep., 114:10-12)

**45.**  UI testified it "never guarantee[s]" the victim's safety and allowing Bethany to take common classes by audio recording was for her safety.  (Agidius 30(b)(6) Dep., 141:1-13)

**46.**  UI did not view Bethany's safety concerns as valid and allowed her to take common classes by audio recording to avoid being in class with the perpetrator to address her "perception of safety."  (Agidius 30(b)(6) Dep., 142:17-143:5)

**47.**  On other occasions, UI **has** taken interim steps during the Title IX investigation to prohibit perpetrators from being in the same buildings and locations as sexual assault victims, but in response to Bethany's safety concerns in this matter, UI repeatedly indicated that it could not

remove the assailant from shared classes. (Agidius 30(b)(6) Dep., 154:4-13)

**F.     There Was No Serious Discussion at UI About Removing the Perpetrator from Common Classes.**

**48.**  UI testified that it does not recall any discussions taking place about removing the perpetrator from common classes with Bethany, the victim.  (Agidius 30(b)(6) Dep., 138:22-139:2)

**49.**  After the sexual assault, the assailant was permitted to remain in two common classes with Bethany, in the Spring 2016 semester, Wills and Evidence. Three days per week Bethany would have two classes with her assailant, along with having daily contact with him in the law school building. (Dodge Dep., 120:4-11; Mikolas Dep., 85:11-15; Mikolas Decl., ⁋ 3)

**50.**  In addition to safety concerns, in the Spring 2016 semester, Bethany expressed to UI personnel she was suffering from depression and severe debilitating anxiety, from being in the same classes with the assailant.  (Mikolas Dep., 102:13-16; 222:9-22; Mikolas Decl., ⁋ 4)

**51.**  UI's psychological expert testified that being in the presence of the assailant can cause depression and anxiety for the victim of a sexual assault. (Green Dep., 17:22-25)

**52.** Bethany thought about dropping out of school. (Mikolas Dep., 113:22-25)

**53.** Agidius recognized that the 2010 DCL, 2011 DCL and 2014 Question and Answer Provision for Title IX all discuss removing the perpetrator from common classes with the victim as an interim accommodation. (Agidius Dep., 135:15-23; 137:4-8; 138:6-11)

**54.** UI testified that it **has** removed the perpetrator from common classes with the victim as an interim accommodation in other Title IX cases, including non-sexual assault cases. (Agidius 30(b)(6) Dep., 139:3-20; Agidius Dep., 70:7-10)

**55.** During the Spring 2016 semester, the assailant deliberately approached Bethany, made eye contact with her, got in close proximity to her, walked past her study carrel so she would see him, smoked cigarettes in places he knew she would be based on her schedule, and would stare at her

aggressively to intimidate and harass her. (Mikolas Dep., 85:20-86:7; 88:14-25; 91:21-24; 92:8-93:7; 236:18-22; Mikolas Decl., ℙ 5)

56. When Bethany "consistently" raised concerns with UI personnel regarding these interactions, and the fear and anxiety they caused, she was told "just don't talk to him," which she had no intention of doing. (Mikolas Dep., 89:11-90:25; Mikolas Decl., ℙ 6)

57. Accordingly, Bethany stopped attending school events, stopped studying and interacting at school, and was only at school when absolutely necessary. (Mikolas Dep., 100:18-24)

58. Once it became apparent UI was not going to help Bethany and the investigation dragged on, the anxiety, fear, and hopelessness became too much so she did not go to school, or even leave her house, for long periods of time. She had difficulty getting out of bed and struggled taking care of her herself and her children. (Mikolas Dep., 119:14-120:3; 190:15-191:2; 214:14-23) Mikolas Decl., ℙ 7)

59. Bethany's husband testified she would lay on the couch for weeks without moving, could not get out of bed, suffered trauma, pain, and suffering because of UI's failures, and would relive the assault when she saw the assailant. (Scoggin Dep., 28:4-17; 74:15-75:4; 88:16-89:20; 122:10-15)

**G.** **Bethany's Multiple Requests to Remove the Assailant from Her Small Common Class in the Fall 2016 Was Refused by UI, Until She Threatened to Hire Legal Counsel and File a Claim With the OCR.**

60. On August 2, 2016, almost three weeks before the Fall 2016 semester began, Bethany recognized the assailant's name on a class email list for her upcoming bankruptcy class, and immediately requested that the assailant be removed from that elective class they both had registered for which it had a small number of approximately twenty students and was not needed to graduate. (Agidius 30(b)(6) Dep., 75:19-22; Agidius Dep., 94:20-25; 95:9-12; Dodge Dep., 76:9-12; 126:21-25; 139:14-19; 173:20-174:1) Mikolas Decl., ℙ 9)

61.  Bethany requested that the assailant take the common class by recording (like she did repeatedly in the Spring 2016 semester) or take a different class. Bethany did not care what the assailant did as long as she did not have to be in contact with the man who sexually assaulted her for another class. (Mikolas Dep., 175:12-176:3; 178:21-25; Mikolas Decl., ¶ 9)

62.  UI's psychological expert testified it is reasonable for a sexual assault victim to request not to be in the same physical area as her assailant. (Green Dep., 18: 1-4)

63.  UI's psychological expert also testified that Bethany's fear of being in the same classroom as the assailant, was consistent with sexual assault victims, and Bethany was being honest and genuine when asking for help from UI to remove the assailant from her common class because she genuinely feared him. (Green Dep., 72:25-74:3, 16-23)

64.  Agidius testified that as a sexual assault victim, removal of the assailant was reasonable from Bethany's perspective. (Agidius Dep., 95:13-19)

65.  UI understood this to be an accommodation request. (Dodge Dep., 156:16-21)

66.  On August 2, 2016, Bethany sent an email to Dean Dodge, among others, stating she was very concerned about being in a small class with the perpetrator and she does not think she can be in the same room as him. (Dodge Dep., 152:10-13; O'Doherty Decl., Ex. M, August 2, 2016 email)

67.  On August 18, 2016, Bethany again emailed Dean Dodge, among others, reiterating that she could not be in class with the assailant. (Dodge Dep., 155:20-23; 156:22-157:1; O'Doherty Decl., Ex. N, August 18, 2016 email)

68.  Roberts, who testified he had no role in Bethany's accommodations, emailed it would be unfair to remove the assailant. (Dodge Dep., 160:23-161:9; Roberts Dep., 61:16-19; O'Doherty Decl., Ex. O, August 18, 2016 email)

69.  DOS employee, Hassel Morrison ("Morrison"), agreed with Roberts, stating the assailant

needed an "academic path" and removing the assailant would be "without reason." (O'Doherty Decl., Ex. O, August 18, 2016 email)

**70.** Dean Dodge testified the assailant could not be removed because he had another appeal coming. (Dodge Dep., 163:10-17; 164:13-17; 164:21-165:2)

**71.** On August 21, 2016, the night before the common class was to start, and having seen no response, Bethany emailed Dean Dodge, among others, stating that UI was not taking her safety seriously, she does not know what to do in the morning for class, and "being in the same class room with [the assailant] will not work for me." (Dodge Dep., 176:17-19; O'Doherty Decl., Ex. P, August 21, 2016 email)

**72.** Dean Dodge responded to Bethany that Agidius and the DOS office determined the assailant was "permitted to attend the class while the final appeal awaits a decision." (Dodge Dep., 177:25-178:7, 15-20; 179:1-5, 9-12; O'Doherty Decl., Ex. P, August 21, 2016 email)

**73.** Dean Dodge testified that he was sympathetic to Bethany's request, but was instructed by OCRI and DOS employees not to remove him. (Dodge Dep., 182:10-16)

**74.** At this time, the SDRB for UI had already ruled the assailant had violated the student code of conduct by sexually assaulting her. (Agidius 30(b)(6) Dep., 87:21-88:7; 88:17-89:2)

**75.** That same day, on August 21, 2016, Bethany emailed Dean Dodge, stating, among other things, she "will not be in the same class room with" the assailant, "there is no way to avoid contact in a small class room," she was not receiving reasonable support from UI, and she would be getting her "own legal assistance to address the substantial detriment this has created to [her] education and access to classes." (O'Doherty Decl., Ex. Q, August 21, 2016 email)

**76.** Dean Dodge understood this email to mean she was accommodating the assailant, she believed she was receiving no support and was seeking legal counsel. (Dodge Dep., 185: 7-14)

**77.** Dean Dodge responded he would have her classes recorded if she wanted "to take this further" and he would inform the "officials in charge" Bethany was not satisfied with the support received. (Dodge Dep., 186:16-19; O'Doherty Decl., Ex. Q, August 21, 2016 email)

**78.** On August 21, 2016, Bethany responded to Dean Dodge that the instructor should already know about the no-contact order to maintain her safety and it has been rendered meaningless, she is not receiving "any of the promised protection from interaction with" the assailant, the responsibility is on her to take classes by recording, stay quiet, find her way to the backseat, and wait silently to return safely to the school, the assailant has not been asked to take classes by recording, UI's actions are "inadequate and unacceptable" and it is impossible to believe UI is concerned about her. (O'Doherty Decl., Ex. R, August 21, 2016 email; Dodge Dep., 195:1-196:4; 198:23-199:9)

**79.** On August 21, 2016, Bethany emailed Roberts about her intent to file a report with the Board of Education for UI's handling of her case and that in the Spring 2016 semester she was forced to sit in the back row, stay home, move study carrels, use her friends to walk with her for safety, told to suck it up and face the assailant or transfer to Boise, she kept running into the assailant, and was again told to take classes by recording rather than removing the assailant. Bethany told Roberts she was hiring a lawyer. (Dodge Dep., 201:10-13; O'Doherty Decl., Ex. S, August 21, 2016 email)

**80.** Another law student, who also had no contact order against the assailant, emailed UI expressing her disbelief and concern that Bethany was again being placed in a common class with the assailant. (Dodge Dep., 204: 8-24; 206:3-13; O'Doherty Decl., Ex. T, August 22, 2016 email)

**81.** Following the first bankruptcy class in which UI refused to remove the assailant, Bethany sent an email stating she had "abstained from attending class this morning in order to avoid in any way, shape, or form inconveniencing the man who sexually assaulted me while seeing to my own

safety," and "[p]lease let me know if there is anything else I can do to make easier for the university and those that perpetrate sexual violence." (O'Doherty Decl., Ex. U, August 22, 2016 email)

82. That same day, Bethany then emailed the professor that she was unable to attend class because she was not being accommodated related to another student that had been found to have violated the student code of conduct and the professor was "alarmed" by what he had learned. (Dodge Dep., 214:2-14; O'Doherty Decl., Ex. V, August 22, 2016 email)

83. Agidius responded that Bethany could continue to take the common class by audio recording and that the assailant would continue to take classes, including the "potential for overlap in classes." (O'Doherty Decl., Ex. W, August 22, 2016 email)

84. Bethany responded this did not resolve her concerns at all, this was not reasonable to both sides (referring to the Title IX link she sent Agidius), it was not reasonable that she be forced to leave the school again, and recording was not an accommodation, but a punishment. (Ex. W, August 22, 2016 email)

85. Agidius again responded to Bethany that day stating she could take the class by audio recording rather than removing him. (Agidius Dep., 159:18-25)

86. UI testified that it never asked or required the perpetrator to take common classes by recording so Bethany could attend class. (Agidius 30(b)(6) Dep., 110:11-19; 117:16-21; Dodge Dep., 68:4-6; 69:7-12; 228:3-7, 16-19; 234:15-20)

87. UI and its employees testified that it **could** have removed the perpetrator from Bethany's small common class as an accommodation and that the DCLs advise to take such action, but UI made the decision not to do so. (Agidius 30(b)(6) Dep., 76:19-24; 77:25-78:3; 86:13-19; 86:20-87:1; 107:2-6; Dodge Dep., at 68:23-69:6; 127:1-6; 127:25-128:10; 130:1-8; 172:21-24)

88. Title IX Coordinator Agidius testified that UI had the option to remove the perpetrator from

common classes with Bethany, but refused to do it. (Agidius Dep., 168:20-169:5)

**89.**  UI even testified it had the ability to remove the perpetrator from the campus entirely during a Title IX investigation.  (Agidius 30(b)(6) Dep., 85:7-11; 86:6-12)

**90.**  UI testified that often the perpetrator will remove himself from common classes with the victim "voluntarily," but this one did not. (Agidius 30(b)(6) Dep., 86:13-19)

**91.**  UI testified it was aware sexual assault victims often have trouble being in the same class with the assailant and that placing Bethany in the same class with him could impact her education and that as a victim she may not feel safe. (Agidius 30(b)(6) Dep., 143:9-21; 144:10-18)

**92.**  The Title IX Coordinator recognized placing Bethany in the same class with the assailant could cause mental health issues and impact her education. (Agidius Dep., 146:19-22; 147:7-14)

**93.**  Dean Dodge testified he considers sexual assaults "to be some of the most significant aspects of Title IX Complaints." (Dodge Dep., at 119:8-10)

**94.**  Roberts and Atkins both testified they were trained sexual assaults are traumatic events in which victims have trouble being in the presence of the assailant, and both viewed the assault as traumatic for Bethany. (Roberts Dep., at 55:24-56:10; Atkins Dep., 34:8-20; 35:16-25; 66:12-16)

**95.**  UI officials who refused to remove the assailant from class receive training that sexual assaults are traumatic events, the victim generally has trouble being in the presence of the perpetrator, and placing the victim in the same class with the assailant can negatively impact their education. (Dodge Dep., at 55:13-57:12; 145:5-8, 22-25)

**96.**  UI's psychological expert testified sexual assaults are traumatic events, and victims have trouble being in the presence of the assailant due to safety concerns. (Green Dep., 17:11-21)

**97.**  Dean Dodge testified UI's refusal to remove the assailant from the common class with Bethany left her with two options – "physically attend" with the man who sexually assaulted her or listen

to "audio-recorded versions of the class" again at home. (Dodge Dep., 131:23-132:13)

**98.** Agidius testified that if Bethany did not want to attend common classes with the assailant, the only options available were to take classes by recording, remain in class with her assailant, withdraw from school, or switch campuses. (Agidius Dep., 139:25-140:6; 140:10-141:17)

**99.** Bethany also testified her two options were to attend class with the assailant who sexually assaulted her or stay home and listen to audio recordings. (Mikolas Dep., 227:3-22)

**100.** Dean Dodge acknowledged taking the class by audio recording was a burden that did not allow Bethany to see the notes or the board, and was "not nearly the educational experience one would get if they were sitting in the class."  (Dodge Dep., 79:10-13; 133:21-24)

### H.    After Bethany Threatened to Obtain Legal Counsel and File a Complaint with the BOE, UI Removed the Assailant from the Common Class.

**101.** On August 26, 2016, after repeatedly denying Bethany's requested accommodation and allowing her assailant to attend the common bankruptcy class, UI claims that it collaboratively decided to remove the perpetrator from Bethany's class and have him take the class by recording. (Agidius 30(b)(6) Dep., 90:4-91:1; Eckles 30(b)(6) Dep., 10:24-11:5; Dodge Dep., 225:1-4)

**102.** Before August 26, 2016, UI had never removed the assailant from the common classes. (Agidius 30(b)(6) Dep., 117:3-6; Agidius Dep., 162:13-16; Dodge Dep., 174:19-23; 175:5-8)

**103.** The decision to remove the assailant only came after Bethany threatened legal action against UI and to file a complaint with the OCR. (Mikolas Dep., 219:14-24; 230:12-17; 231:14-19; O'Doherty Decl., Ex. S, August 21, 2016 email; O'Doherty Decl., Ex. Q, August 21, 2016 email; Mikolas Decl., ¶ 10)

**104.** UI testified it does not know why it changed its decision and removed the perpetrator from the common class after allowing him to attend multiple classes. (Agidius 30(b)(6) Dep., 91:6-20)

**105.** UI is not aware of any change in circumstances that would cause it to reverse its decision

and remove the assailant from common classes. (Agidius 30(b)(6) Dep., 116:12-16)

**106.** Title IX Coordinator Agidius does not "recall the rationale" for UI reversing its decision and removing the assailant from the common class. (Agidius Dep., 154:11-14)

**107.** UI does not know whether the decision was made at one meeting or multiple meetings, does not know who attended despite claiming up to ten people were there, does not know the date or dates, and does not recall the substance of any discussions. (Agidius 30(b)(6) Dep., 91:25-93:18; Eckles 30(b)(6) Dep., 11:6-21)

**108.** Prior to this, UI officials had never convened meetings, in person or by telephone, to discuss Bethany's safety concerns, severe anxiety and depression, shared common classes with the assailant, or accommodation requests. (Agidius 30(b)(6) Dep., 93:19-94:6; 125:22-126:3, 17-21)

**I.      UI Falsely Claims It Asked Bethany and the Perpetrator to Alternate Attending the Bankruptcy Class Before He Was Finally Removed.**

**109.** UI claims that it instructed Bethany and the perpetrator to alternate attending the common class when the class first started. (Eckles 30(b)(6) Dep., 13:2-9; 13:19-14:17; 16:20-25)

**110.** Bethany denies that she was ever told to alternate attending the common class with the assailant, but instead, refrained from going since UI would not remove him. Bethany could not handle the fear, anxiety and depression that comes with seeing her assailant in class again like she experienced in the Spring semester. (Mikolas Decl., ⁋ 11)

**111.** UI testified that it does not know if the assailant refrained from attending the class, took the class by audio recording or was even told to alternate classes, before he was finally removed on August 26, 2016. (Eckles 30(b)(6) Dep., 14:18-15:14; 17:6-8)

**J.      UI's Explanations for Refusing to Remove the Assailant from the Bankruptcy Class Are Ever Evolving and Have Proven Inaccurate.**

**112.** UI first claimed it could not remove the assailant from the small common class with Bethany

because the perpetrator's appeal was still pending and it needed to see the outcome of the appeal. However, UI then removed the assailant from the class a month before his appeal was decided on September 26, 2016. (Agidius 30(b)(6) Dep., 76:11-18; 79:14-23; 111:13-16; Dodge Dep., 165:4-17; 179:9-21; 181:12-22; 225:13-19; Agidius Dep., 163:15-19; 166:8-16; 170:25-171:5)

113.   UI then claimed it could not remove the assailant because his due process rights prevented it, but again, UI removed him once Bethany threatened legal action. (Agidius 30(b)(6) Dep., 145:12-20; Agidius Dep., 153:3-11; Dodge Dep., 127:25-128:7; 134:13-16)

114.   Agidius then testified that UI could not remove the assailant because "there was an appeal pending" and UI could not remove the assailant from common classes "until the conclusion of the appeal process," defining the appeals process as the SAC decision. However, at the time the assailant was finally removed the SDRB hearing had not concluded and he had not even filed his appeal with SAC. (Agidius Dep., 95:1-7; 96:4-5; 150:8-10; 151:2-21; 152:2-15; 152:23-153:2; Dodge Dep., 165:4-17)

115.   Agidius then testified the perpetrator could not have been removed because the common class was not an "extracurricular activity." (Agidius Dep., 148:21-149:4)

116.   UI then claims the decision was made at a single meeting because the assailant had been found guilty a second time of violating the student code of conduct by the SDRB; however, the perpetrator was removed from the common class on August 26, 2016, and the second decision by SDRB did not occur until August 30, 2016 – four (4) days later.  (Eckles 30(b)(6) Dep., 11:22-13:18; 17:14-18:18; 22:12-23:3; Dodge Dep., 165:4-17; 225:5-12)

117.   Blaine Eckles ("Eckles") does not recall having any specific conversations about removing the assailant from the class prior to the meeting at issue. (Eckles 30(b)(6) Dep., 23:12-20)

118.   UI's interpretation of how the decision was made to remove the perpetrator from the common

class also varies, with Agidius claiming it was a collaborative decision, and Eckles claiming he made the decision unilaterally.  (Agidius Dep., 157:4-6; 162:17-20; Eckles 30(b)(6) Dep., 18:19-19:13; 20:9-18)

**119.**  Eckles claims he made the decision to remove the assailant, but he was not consulted about any of Bethany's other accommodation requests. (Eckles 30(b)(6) Dep., 20:19-21:4)

**120.**  Eckles was not consulted about Bethany's common classes with the assailant in the spring semester or her initial request to remove the assailant in early August, and instead, was only consulted almost a month later after she threatened legal action. (Eckles 30(b)(6) Dep., 22:4-7)

**K.**     **Claimed Accommodations Provided to Bethany.**

**121.**  Agidius testified the only accommodations provided to Bethany by UI was a pamphlet with various resources listed, asking the perpetrator to switch smoking locations, and providing recordings of classes so Bethany would not have to be in class with the assailant.  (Agidius Dep., 88:16-22; 91:9-20; 161:17-19)

**L.**     **Claimed Accommodations Requested of the Perpetrator.**

**122.**   The only accommodations UI ever requested of the assailant was that he not attend law review events, that he change his smoking location, and, after the threat of litigation from Bethany, telling the perpetrator to take the bankruptcy class by audio recording.  (Agidius 30(b)(6) Dep., 111:17-112:17; 114:6-115:3; Agidius Dep., 100:22-101:7)

**123.**  Dean Dodge never made a single request of the assailant to accommodate Bethany and was not aware of any accommodation requests made to him. (Dodge Dep., at 81:16-22; 82:11-13)

**124.**  With respect to law review, by the time the assailant was asked not to attend any more law review events, Bethany had voluntarily removed herself from law review to avoid him after she was told to attend a law review event at a bar with the assailant shortly after he sexually assaulted

her.  UI never even bothered to inform Bethany the perpetrator had been instructed not to attend law review events so she abstained from going to them anyways. (Agidius Dep., 102:11-16; Mikolas Dep., 96:6-8; Mikolas Decl., 12)

**125.**  Dean Dodge was also never told the assailant was instructed not to attend law review events and encouraged Bethany to attend an event with the assailant, which she refused. (Dodge Dep., 107:5-8; 107:21-108:3, 14-21; 110:3-7)

**M.     Other Accommodations Refused by UI.**

**126.**  UI denied Bethany's requests for video conferencing of common classes with her assailant despite acknowledging such requests were reasonable. (Agidius Dep., 97:12-24)

**127.**  UI denied Bethany's accommodation requests that the assailant switch study carrels because her carrel was close to his and she did not feel safe, despite agreeing this request was reasonable from Bethany's perspective.  (Agidius Dep., 98:25-99:12)

**128.**  UI never requested that the perpetrator switch study carrels so that Bethany could feel safe and made her switch. (Agidius 30(b)(6) Dep., 118:2-4; Mikolas Dep., 118:7-9)

**129.**  UI never requested that the perpetrator switch seats to the back of common classes, rather Bethany sat in the back to avoid the assailant. (Agidius 30(b)(6) Dep., 118:10-13, 21-24; Mikolas Dep., 86:22-87:4; 225:17-25; 229:18-23)

**130.**  UI never offered Bethany academic support or tutoring despite her struggling in her classes in Spring 2016. (Agidius Dep., 190:10-17; Mikolas Dep., 213:18-21; 214:8-13; 222:3-22)

**131.**  UI denied Bethany's multiple requests that the assailant take classes by recording so she could attend. (Agidius Dep., 96:12-19; Dodge Dep., 70:12-16; Mikolas Dep., 229:24-230:7)

**132.**  Agidius testified that the perpetrator could have taken common classes by recording so Bethany could attend, but that UI never discussed Bethany's request nor did they look into the

possibility of the assailant registering in a different class. (Agidius Dep., 147:23-148:1; 161:2-5)

**133.** UI never told Bethany the assailant would be walking at graduation, even though he had been suspended for a semester, and Bethany was forced to abstain from walking at graduation after having an anxiety attack. (Agidius 30(b)(6) Dep., 119:8-10; Dodge Dep., 75:9-22; Dodge Dep., 256:10-17; Mikolas Dep., 100:18-101:6; 147:21-148:3)

**N.**   **Rather Than Help Bethany UI Told Bethany She Could Uproot Her Entire Family and Move to Boise, and File a Complaint with the OCR.**

**134.** On March 30, 2016, after Bethany expressed her concerns that UI was not helping her and she did not feel safe, Agidius, in conjunction with Dean Dodge, told Bethany UI would waive the deadlines if she wanted to move her entire family to Boise to finish law school, and Bethany responded in disbelief UI would suggest moving to Boise to "attend classes in a less hostile environment," she was experiencing harassment, and she could not identify "a single way" UI has supported her access to school and continued education.  (Agidius 30(b)(6) Dep., 99:9-13; Dodge Dep., 73:7-18; Mikolas Dep., 117:14-118:6; O'Doherty Decl., Ex. X, March 30, 2016 email)

**135.** UI does not recall ever telling another student that made a Title IX Complaint she could move to another campus rather than work to provide a safe educational environment on the current campus. (Agidius 30(b)(6) Dep., 100:13-25)

**136.** UI never requested or required the assailant uproot his entire life and transfer to Boise. (Dodge Dep., at 73:23-74:2; Agidius 30(b)(6) Dep., 118:25-119:2)

**137.** On August 23, 2016, Bethany emailed Agidius a link regarding Title IX's requirements that the victim and perpetrator must share the burden of accommodations because the perpetrator had not shared in the accommodations at all and Bethany had been forced to accommodate the perpetrator. (Agidius Dep., 241:8-16; 243:8-12; 244:11-16; 248:10-14; O'Doherty Decl., Ex. Y, August 23, 2016 Email)

**138.**  Rather than help Bethany and address her concerns, regarding the hostile environment, Agidius responded that if she was unhappy to file a complaint with the OCR. (Agidius 30(b)(6) Dep., 102:23-103:2; Agidius Dep., 246:14-21)

**139.**  Agidius, the person responsible for complying with Title IX at UI, testified she did not know whether the burden of accommodations must be shared.  (Agidius Dep., 241:23-242:2)

**140.**  UI did not discuss Bethany's concerns that it was violating Title IX until Bethany threatened legal action.  (Agidius 30(b)(6) Dep., 101:1-102:10)

**O.**  **UI Made the Decision to Remove the Perpetrator from All Common Classes With Bethany for the Spring 2017 Semester Only After it Became Aware the Tort Claim Was Filed by Bethany and She was Leaving the Campus.**

**141.**  UI informed its faculty by email that Bethany filed a tort claim against UI on September 22, 2016. (Agidius 30(b)(6) Dep., 97:10-21; 98:11-13)

**142.**  Shortly thereafter, on November 2, 2016, UI made the decision to restrict the perpetrator from attending all common classes with Bethany for the Spring 2017 semester after he returned from suspension.  (Mikolas Dep., 142:11-143:24)

**143.**  With the assailant returning from suspension for the Spring 2017 semester, Bethany made the decision to do a semester in practice away from the campus. (Mikolas Dep., 141:14-142:6; Dodge Dep., 260:16-261:5)

**144.**  UI does not know who made the decision to restrict the assailant from attending classes with Bethany for the Spring of 2017 semester.  (Agidius 30(b)(6) Dep., 95:5-10)

**P.**  **UI and Faculty Understood the DCLs to Be Guidance Documents They Were Required to Follow, But Did Not Consult Them in Bethany's Matter.**

**145.**  The OCR's DCLs in place in 2016 were the guidance documents that UI was required to follow to stay in compliance with Title IX and its employees were trained to follow the DCLs. (Dodge Dep., at 44:24-45:4; Atkins Dep., at 31:20-32:2)

**146.**   Agidius considers the DCLs guidance for staying in compliance with Title IX and for accommodation issues; if Agidius had questions on accommodations she would consult the DCLs for guidance. (Agidius Dep., 36:21-37:13; 37:24-38:2; 46:13-15; 47:19-21; 48:6-16; 52:22-53:14)

**147.**   Despite being guidance documents on Title IX, Agidius does not recall reviewing the DCLs for guidance in Bethany's case. (Agidius Dep., 54:3-19; 59:9-13)

**Q.    Mental Health Issues.**

**148.**   UI's failures deepened Bethany's trauma and caused her to suffer major mental health issues, including diagnosed anxiety, depression, and PTSD, for which she has been receiving regular counseling and medication. (Mikolas Dep., 170:16-172:11; Green Dep., 84:7-14)

**149.**   UI's expert psychologist opined that Bethany suffers from diagnosed major depressive and anxiety disorders, caused in part, by UI's handling of her Title IX case and failure to keep the matter confidential. (Green Dep., 58:7-18; 59:11-15; 64:14-18)

**150.**   UI's expert psychologist also testified that Bethany suffers from pervasive psychological injuries from the assault and her perception of UI's handling of the matter thereafter.  (Green Dep., 78:18-25; 80:14-81:3; 83:25-84:6)

**151.**   Due to her mental state, Bethany did not take the bar exam for a year. (Scoggin Dep., 122:3-6)

**152.**   UI's failure to accommodate Bethany impacted her marriage and played a role in her recent divorce from her husband. (Scoggin Dep., 22:18-23; 24: 4-9; 25:16-22; 26:9-12; 121:10-17)

DATED this 10th day of June, 2019.

RANDALL | DANSKIN, P.S.

s/ Shamus T. O'Doherty
Shamus T. O'Doherty, ISB #9626
Brook L. Cunningham, *Pro Hac Vice*
Attorneys for Plaintiff

## CERTIFICATE OF SERVICE

The hereby certify that on the 10th day of June, 2019, I caused to be served the foregoing document on the following via electronic mail:

Peter C. Erbland                          perbland@lclattorneys.com
Katharine B. Brereton                     kbrereton@lclattorneys.com
Lake City Law Group, PLLC
435 W. Hanley Avenue, Suite 101
Coeur d'Alene, ID  83815



s/ Shamus T. O'Doherty
Shamus T. O'Doherty, ISB #9626
Brook L. Cunningham, *Pro Hac Vice*
Attorneys for Plaintiff